[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
CT Page 4909
The plaintiffs in these two cases appeal a decision of the Connecticut Department of Public Utilities and Control authorizing the auction of certain purchase power agreements defendant Connecticut Light and Power Company has entered into with private power providers.
The plaintiffs in Connecticut Resources Recovery v. ConnecticutDepartment of Public Utility, Docket No. 0493967 are Connecticut Resources Recovery Authority, a political subdivision of the State of Connecticut created by the Solid Waste Management Services Act, Chapter 446e of the Connecticut General Statutes, which developed several resource recovery facilities in Connecticut, including facilities within Connecticut Light and Power Company's service territory; (2) Southeastern Connecticut Regional Resource Recovery Authority, a political subdivision of the State of Connecticut and composed of members from fourteen towns in eastern Connecticut; and (3) Bristol Resources Recovery Facility Operating Committee consisting of members from fourteen towns in central Connecticut. The facilities of The Connecticut Resources Recovery Authority sells electricity to Connecticut Light and Power Company pursuant to long term energy purchase agreements. Its participating towns have a beneficial interest in the power purchase agreements with CLP. The towns of Southeastern Connecticut Regional Resources Recovery Authority and of the Bristol Resources Recovery Facility Operating Committee have beneficial interests in the power purchase agreement between CLP and the Connecticut Resources Recovery Authority, Southeastern Connecticut Regional Resources Authority and two other entities which provide for the sale of electricity to CLP.
In Cogeneration Coalition v. DPUC, Docket No. 0493968, the plaintiffs are Connecticut Cogeneration Coalition and the Connecticut Small Power Producers Association. The Coalition is a trade association of cogeneration power producers whose members own and operate electric generation facilities producing power that is sold to the Connecticut Light and Power Company under long term power purchase agreements. The Connecticut Small Power Producers Association is also a trade association whose members own and operate small hydro electric and other renewable energy generation facilities and have entered into long term power purchase agreements with Connecticut Light and Power Company.
The defendant, Connecticut Light and Power Company (CLP) is a public CT Page 4910 service company defined by C.G.S. § 16-1. The defendant Department of Public Utilities and Control (DPUC) is an agency of the State of Connecticut charged by statute with the regulation and supervision of public service companies, pursuant to C.G.S. § 16-1, et seq.
In 1998 the Legislature enacted Public Act 98-28 entitled An Act Concerning Electric Restructuring, C.G.S. §§ 16-244-245y. That Act requires electric companies to separate or "unbundle" their generating facilities from their transmission and distribution facilities to allow for competition in the retail sale of electricity. The Act limits companies like CLP to the status of regulated distribution companies, controlling the wires over which the electricity is delivered, while requiring the divestiture of their energy generating assets. Section 16-244f(b)(1) provides that electric companies shall submit its nonnuclear generation assets, and § 16-244g(b) requires it to submit its nuclear generation assets to a public auction held in a commercially reasonable manner.
Section 16-244e(a) provides that electric companies shall submit a plan to DPUC to unbundle or separate by October 1, 1999 all the companies' generation assets. Pursuant to this requirement, CLP submitted such a plan that included not only the public auction of its nonnuclear generation assets, but also offering by public auction its interest in certain power purchase agreements (PPAs) CLP had with various private power providers (PPPs).
These agreements arose as a result of a federal (Public Utilities Standards Act, (16 U.S.C. § 761 et seq.)) and state statutes (§ 16-243a-243h) enacted in the mid 1980's to encourage alternate sources of energy. The price to be paid for electricity in those agreements were negotiated between CLP and PPP's based on future or "avoided costs" and approved by DPUC. The terms of such agreements were for periods up to 30 years. Today those prices per kilowatt hour far exceed market prices for electricity. For example, the Wallingford Refuse to Energy Project agreement requires CLP to pay 37.9 cents per kilowatt hour for on peak and 13.8 cents per kilowatt hour for off peak power, compared with approximately 4 cents per kilowatt hour for energy CLP charges its residential customers. The difference between the contract and the market prices for such electricity required to be purchased by CLP from PPPs are called "stranded costs" and passed on to the rate payers.
A significant provision of the PPAs is:
 The rights and obligations of the parties to this CT Page 4911 Agreement may not be assigned by either party except upon the express written consent of the other party, which consent shall not be unreasonably withheld. As a condition of its consent, any person to whom an assignment is made shall be required to demonstrate, to the reasonable satisfaction of the non-assigning party, that it is capable of fulfilling the assigning party's obligation under this agreement.
Pursuant to § 16-245e(f)(2) CLP is entitled to recover on an annual basis the amount by which payments under the PPAs exceed current wholesale price for electricity for the duration of any agreements that are not bought out. DPUC estimates that the present value of stranded costs arising from these PPAs is approximately 1.5 billion dollars.
Section 16-245e(c)(1) provides that electric companies seeking to claim stranded costs shall:
. . . mitigate such costs to the fullest extent possible. Prior to the approval by the department of any stranded costs, the electric company shall show to the satisfaction of the department that the electric company has taken all reasonable steps to mitigate to the maximum extent possible the total amount of stranded costs that it seeks to claim and to minimize the costs to be recovered from customers. Mitigation shall include . . . (B) good faith efforts to negotiate the buyout, buydown or renegotiation of independent power producer contracts and purchased power contracts approved by the Federal Energy Regulatory Commission. . . .
Section 16-245e(f)(1) provides "The department shall calculate the stranded costs for long term contract costs that have been reduced to a fixed present value through buyout, buydown or renegotiation of independent power producer contracts and purchased power contracts approved by the Federal Energy Regulatory Commission as such present value."
Section 16-245f provides that "those long term contract costs that have been reduced to a fixed present value through the buyout, buydown or renegotiation of such contracts" shall be funded by rate reduction bonds.
Section 16-244e(a)(4) provides that "All entitlements and obligations from any purchase power contracts or independent power CT Page 4912 producer contract entered into before July 1, 1998 by the predecessor electric company which are not bought out, shall succeed to the electric distribution company."
In the decision herein appealed from, the DPUC made the following findings of fact: (1) In the past CLP has attempted to buyout, buydown or renegotiate its power agreement obligations but has had limited success. In 1993 it reached settlement agreements with two hydro-electric projects resulting in total savings to CLP rate payers of $764,000 over the initial five year period and approximately 2 million dollars over the life of the unamended contract. In addition, CLP successfully negotiated the buyout of two purchased power agreements in 1995 and 1998 resulting in projected savings to rate payers of 30 million dollars over the life of those agreements. "Despite repeated attempts and the use of every available leveraging tool, the company has not been able to restructure the vast majority of these agreements."
(2) These purchase power agreements are now eligible for securitization under the Restructuring Act. The company acknowledged that this provides a new "dynamic to the financial analysis that goes into a buydown or buyout." In addition, the decision indicated that, pursuant to § 16-245a, portfolio standards for electric suppliers requires all licensed suppliers to demonstrate that a certain percentage of their total electrical output is provided by renewable energy sources. "Securitization and portfolio standards enhance CLP's negotiating position with respect to PPP mitigation efforts."
The department concluded that the auctioning of the PPP contracts is consistent with the overall divestiture scheme set forth in the Act. The decision states, "Indeed the auction of these contracts is thoroughly consistent with the overall scheme of the act for the current vertically integrated electric company to divest itself of its generation resources. The inclusion of these contracts in an auction process advances the overall public policy of the act . . . However the department believes that the rate payers would be in the best position to achieve a reduction in stranded costs associated with PPP contracts if the contracts were auctioned at the same time as the generating assets. Therefore the department finds that the public interest would be better served by the department's auction consultant conducting the PPP contract action separately but in parallel with that of the generating assets. Further, the department will require that CLP undertake § 8(c) [section 16-345e(c)(1)] activities with all the PPPs in earnest . . . If any contracts remain unsold after the auction, the company will be required to continue CT Page 4913 mitigation efforts consistent with § 8(c) [section 16-345e(c)(1)]."
The initial issue this court must determine is the matter of standing of the plaintiffs to bring this appeal. Section 4-183
provides that a person may only appeal an administrative agency's decision when he has been "aggrieved by a final decision".
It is well settled in our law that the fundamental test for determining aggrievement encompasses a two fold determination: "First, the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest such as the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that the specific personal and legal interest has been specifically and injuriously affected by the decision . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." LightRigging Co. v. Department of Public Utility Control, 219 Conn. 168,173 (1991).
To the extent that the plaintiffs in these appeals are private power providers they have a specific personal and legal interest in the decision of the DPUC requiring the public auction of power purchase agreements. To the extent that some of the plaintiffs, such as Connecticut Cogeneration Coalition and Connecticut Small Power Producers Association are associations of private power providers, the test for establishing representational aggrievement is stated by the Supreme Court in Connecticut Association of Health CareFacilities v. Worrell, 199 Conn. 609, 616 (1986) as follows: "`[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own rights; (b) the interest it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the suit'"
The Connecticut Cogeneration Coalition and the Connecticut Small Power Producers Association are trade associations whose membership includes entities that own and operate facilities utilizing cogeneration technology or small hydroelectric and other renewable generation facilities and their members have entered into power purchase agreements with CLP. Their members would have the standing to sue in their own right. Their interests sought to be protected are germane to the organization's purposes, and neither the claim CT Page 4914 asserted nor the relief requested requires the participation of the individual members in this lawsuit.
The central question of aggrievement here is not whether the plaintiffs have an interest in subject matter of the decision but whether or not their interest is "specifically and injuriously affected by the decision."
All the parties recognize that DPUC decision does not impair the obligations of the parties to the power purchase agreements nor cannot it by reason of Article I, Section 10 of the United States Constitution prohibiting "impairing the obligation of contracts." As the DPUC said in its decision, "Further, auction of the PPP contracts is not intended to abrogate any rights that the PPPs have under their agreements with CLP."
The plaintiffs contend, however, that: (1) the auction will increase the risk to the PPPs in that CLP's assignees may not be able, over the term of the contract, to pay for the power provided and may go into bankruptcy; (2) the PPAs are presently backed by DPUC's commitment to pass the contract costs through to rate payers and if CLP's interests are transferred to a third party, PPPs lose that credit support for contract payments; (3) third parties will receive a substantial lump sum financed through rate reduction bonds, measured by the difference between the market price for the electricity and the contract price under the PPAs, discounted to present value, giving third parties an incentive to administer the contract so as to find every conceivable way to get out of their obligations under the contracts; (4) the auction will undermine the obligation of CLP to negotiate in good faith a buyout, buydown, or modification of the terms of the PPAs and if that fails, to have the PPAs devolve to the distribution company.
All of those risks, however, already exist by reason of the right of assignment CLP retains in the PPAs. Those agreements give the right to either party to assign its interest, provided express written consent is given by the other party, which consent shall not be unreasonably withheld. If a PPP reasonably withholds consent, the DPUC decision recognizes that CLP remains legally responsible for the contract payments, acts as an agent for the assignee, and, in effect, purchases the power from the PPP and resells it to the assignee.
The auction of PPAs does not change this relationship or diminish any of the rights of PPPs under the PPAs. All the auction does is attract a larger pool of potential assignees. Those assignees stand CT Page 4915 in precisely the same footing as assignees acquired by CLP through bilateral negotiations. Plaintiffs must still consent to the assignments and if reasonably withheld, CLP remains obligated under the PPA as if no assignment was made.
Moreover, as the DPUC decision notes, despite the auction, "CLP is and remains under a continuing duty to pursue in good faith the § 8(c) [§ 16-245e(c)(1)(B)] activities of negotiating the buyout, buydown or renegotiation of PPP contracts." While the Act provides for the funding by rate reduction bonds of the present value of the difference between PPA price and market price for electricity over the remaining terms of the PPAs, giving assignees the opportunity for up-front lump sum payments that may motivate them to try to get out of the burden of PPAs they have bought, this consequence flows from the provisions of the Act, not from the public action. Likewise, while electric companies are now required to have a certain percentage of their electric output provided from renewable energy sources and that enhances prospects for assignment of PPAs, again this results from provisions of the Act not from the auction.
This court perceives no difference to PPPs whether CLP negotiates an assignment of a PPA with an assignee bilaterally or as a consequence of a public auction. Each PPP retains the right to reasonably withhold its consent and the right to the stream of payments provided for under the PPA. The DPUC decision does not invade the right of PPPs to that stream, nor the right of CLP to the right of assignment. Both parties stand in the same position following the DPUC decision as they did before it was issued. The real beneficiaries to the decision are rate payers who stand to have stranded costs reduced if the PPAs are sold through public auction for a higher price than realized by a bilaterally negotiated assignment.
The court recognizes the rule that aggrievement is established if there is the possibility, as distinguished from a certainty, that some legally protected interest will be adversely affected. Hall v.Planning Commission, 181 Conn. 442, 445 (1980); Bakelaar v. WestHaven, 193 Conn. 59, 66 (1984). If "possibility" is taken literally, it has no meaning, because conceptually anything is possible. In the context of the rule above, it must be interpreted as a reasonable possibility.
The court here finds that there is no reasonable possibility that the plaintiffs can be injured as a consequence of a public auction of the PPAs, and thus finds they are not aggrieved. These appeals are, therefore, dismissed for lack of jurisdiction. CT Page 4916
SATTER, J.